IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CHETTY HOLDINGS, INC., et al. | : | |
| | : | CIVIL ACTION |
| v. | : | No. 11-4640 |
| | : | |
| NORTHMARQ CAPITAL, LLC, et al. | : | |
| | : | |

O'NEILL, J.                                                          May 1, 2012

## MEMORANDUM

Plaintiffs Chetty Holdings, Inc. and Carl E. Chetty, trading as Millview Apartment

Homes, LP, filed this action against defendants NorthMarq Capital, LLC; NorthMarq Capital,

Inc.;[1] Amerisphere Mortgage Finance, LLC; AmeriSphere Multifamily Finance, LLC;

AmeriSphere Financial, LLC;[2] and Timothy C. Kuhn seeking damages relating to Millview's

failed effort to obtain a mortgage loan insured by the United States Department of Housing and

Urban Development for the refinance of an apartment complex.  Plaintiffs assert claims against

defendants for negligence, negligent misrepresentation, fraudulent misrepresentation, fraud in the

inducement and concert of action.  Now before me are three motions to dismiss the claims set

---

[1]       NorthMarq Capital, LLC contends that NorthMarq Capital, Inc. was converted to
NorthMarq Capital LLC as of January 1, 2009 and thus ceased to exist before the events giving
rise to this lawsuit.  See Aff. of Michael J. Myers, Dkt. No. 40 at 68-69.  Plaintiffs state that they
have no objection to the dismissal without prejudice of their claims against NorthMarq Capital,
Inc.  Dkt. No. 45 at ECF page 21.  Because plaintiffs have not offered a good faith factual basis
for a claim against NorthMarq Capital, Inc., I will dismiss with prejudice plaintiffs claims against
it.

[2]       There are no allegations in the Second Amended Complaint that specifically
reference either AmeriSphere Multifamily Finance or AmeriSphere Financial and plaintiffs state
that they have no objection to the dismissal without prejudice of their claims against them.  Dkt.
No. 45 at ECF page 21.  Because plaintiffs have not offered any allegations to support a claim
against AmeriSphere Multifamily Finance or AmeriSphere Financial, I will dismiss plaintiffs'
claims against these entities with prejudice.

forth in plaintiffs' second amended complaint, one filed by the AmeriSphere defendants, one filed by the NorthMarq defendants and one filed by defendant Timothy Kuhn.  For the reasons that follow, I will grant defendants' motions.

## BACKGROUND

Millview Apartment Homes, LP is a Pennsylvania limited partnership whose general partner is plaintiff Chetty Holdings, Inc., a Pennsylvania corporation.  Second Am. Compl. ¶ 1-4. Plaintiff Carl Chetty is the principal of Millview and Chetty Holdings.  Id. ¶ 3.  Millview was the owner of a 350-unit apartment complex of the same name in Coatesville, Pennsylvania until sometime in Fall 2010.  Id. ¶¶ 4, 73-75.

Plaintiffs allege that in order to finance the property, on or about September 29, 2005, Millview obtained a fifteen-year forward mortgage from Northwestern Mutual Life Insurance Company in the approximate amount of $27,000,000.  Id. ¶ 30.  The Northwestern Mutual mortgage included a yield maintenance provision that imposed a pre-payment penalty in the event that Millview chose to pay off its indebtedness early.  Id. ¶ 21.  According to plaintiffs, the occupancy rate at the property began to drop in 2008 as a result of the economic downturn.  Id. ¶ 23.  Plaintiffs sought to "rais[e] capital and additional equity through a refinance of the Millview Property."  Id. ¶ 24.  Plaintiffs allege that Northwestern Mutual contacted Chetty in early 2009 and "verbally advised him that, if Plaintiffs were able to re-finance the Property, Northwestern Mutual would be willing to modify the terms of the mortgage loan agreement and waive the pre-payment penalties to allow Millview to pay-off the indebtedness."  Id. ¶ 25.

Plaintiffs also allege that "[i]n January, 2009, Defendant Kuhn, a former Senior Vice President for [defendant] NorthMarq . . . initiated discussions [about the possibility of

refinancing] with Chetty and Lou Voigt, Chetty's colleague." Id. ¶ 26.  Kuhn reviewed

plaintiffs' financial situation and "was eminently aware of Plaintiffs' financial status,

indebtedness, and payment history with Northwestern Mutual, and the fluctuations in occupancy

at the Millview Property." Id. ¶¶ 26-28.  Plaintiffs assert that Kuhn was aware that if plaintiffs

could secure financing "Northwestern Mutual had verbally indicated its willingness to restructure

the mortgage and, for a limited time, waive the pre-payment penalty." Id. ¶ 30.  Kuhn "advised

Plaintiffs that their best option would be to re-finance the Millview Property by applying for a

223(f) FHA/HUD loan through NorthMarq and its underwriting arm, AmeriSphere, which would

prepare and submit the application and obtain the HUD loan on Plaintiffs' behalf." Id. ¶ 31.

On July 7, 2009, Chetty executed an engagement letter[3] with AmeriSphere Mortgage

Finance LLC,[4] in which AmeriSphere agreed "to provide Mortgage Insurance processing

services, and . . . to structure and provide" a mortgage loan to Millview Apartment Homes

Limited Partnership.  Dkt. No. 39, Ex. A at 1.  The loan was to "be insured by the [FHA]

pursuant to its mortgage insurance program." Id.  The project processing summary attached to

the engagement letter set a target amount for a 223(f) FHA loan at $31,467,600 to be amortized

over a period of up to 35 years. Id.  The engagement letter explains that AmeriSphere would

undertake the following in assisting plaintiffs with their application for mortgage insurance from

---

[3]      When considering a motion to dismiss, the Court may take into account any
documents attached to a complaint and any documents integral to or explicitly relied upon in a
complaint.  See Khalil v. Rohm & Haas Co., No. 05-03396, 2005 WL 3111791, at *2 (E.D. Pa.
Nov. 18, 2005).  Plaintiffs did not attach the engagement letter to their Second Amended
Complaint but I may consider the letter without converting defendants' motions to dismiss into
motions for summary judgment because it is integral to the allegations set forth therein.

[4]      AmeriSphere Multifamily Finance and AmeriSphere Financial are not identified
as parties to the agreement letter.

the FHA:

- Complete an initial underwriting and analysis of the Project and provide recommendations regarding the FHA Application.
- Prepare, on the appropriate FHA forms, for the Borrower's prior review, the FHA application to be submitted to FHA for a firm commitment from FHA to provide the Mortgage Insurance ("FHA Firm Commitment").
- Interact with all third party professionals regarding any requirements that are necessary for mortgage underwriting relative to the submission of the FHA application[.]
- Upon receipt of the Borrower's approval, submit the FHA Application to FHA
- Monitor the progress of the FHA Application during the FHA processing and underwriting period.
- Follow-up with you and FHA during the processing period.
- Provide you with copies of all material documents and correspondence submitted to and received from FHA.
- Consult with you and your representatives, including your attorney, surveyor and title agent.
- Assist you with FHA in all phases of the FHA Firm Commitment processing.

Id. at 2.  Under the terms of the engagement letter, "[t]he scope of services to be provided by

[AmeriSphere was] wholly and expressly limited to the matters covered by th[e] Engagement,

and complying with conditions, requirements or procedures imposed by FHA in connection with

the processing of the FHA application and the issuance of the FHA Firm Commitment."  Id. at 4.

The engagement letter also provided, inter alia, that:

(2)  This Engagement is not and shall not be construed as a commitment of or by [AmeriSphere] to make the Loan or any other loan to you.  Any such commitment shall be evidenced by a separate document entitled the Lender's Funding Commitment following issuance and acceptance by Borrower of the FHA Firm Commitment, and shall reflect the requirements of FHA and [AmeriSphere] for Closing and funding of the Loan.

(3)  The Borrower understands, acknowledges and agrees that

-4-

> (I) [AmeriSphere] has not made any representations or warranties
> regarding the results of the FHA mortgage insurance processing . . .
> . While [AmeriSphere] will seek to obtain an FHA Firm
> Commitment and provide a Loan at an interest rate satisfactory to
> you, we cannot promise or otherwise assure you that we will be
> successful. . . .
>
> (11) As stated previously in this Engagement, this Engagement is
> not a commitment by [AmeriSphere] to make the Loan, and the
> ability of [AmeriSphere] to fund and close the Loan is wholly and
> strictly contingent upon (I) FHA issuing its FHA Firm
> Commitment with respect to the Loan, and (ii) [AmeriSphere]
> successfully obtaining funding . . . .

Id. at 4, 6.  The engagement letter stated that "[u]pon completion of its FHA Firm Commitment

processing, FHA may issue an FHA Firm Commitment" and provided for what AmeriSphere

would do "[i]f the FHA Firm Commitment [was] issued." Id. at 2 (emphasis added).

Plaintiffs contend that Kuhn produced the engagement letter to them during a meeting

although Kuhn's employer, NorthMarq, is not named in the letter as a party to the agreement.

Second Am. Compl. at ¶ 33.  Plaintiffs also allege that in July 2009 they retained NorthMarq to

assist with the HUD application process, with Kuhn managing the process.  Id. ¶ 34.  Plaintiffs

do not cite to a separate agreement with NorthMarq.  Id.  The second amended complaint alleges

only that AmeriSphere is "an affiliate of NorthMarq."  Id. ¶ 13.

Plaintiffs allege that sometime in the late summer of 2009 AmeriSphere's underwriting

manager Debbie Van Hoosen sent an email to Kuhn with quotes for third party appraisal fees and

a 223(f) Firm Application Checklist.  Id. ¶ 36.  Kuhn forwarded the information to plaintiffs, who

were to gather "information and documentation necessary for AmeriSphere to review and use in

preparing the 223(f) loan application."  Id.  Plaintiffs contend that they "timely provided Kuhn

and AmeriSphere with all financial documentation and occupancy information with respect to the

Millview Property and openly communicated with Kuhn and AmeriSphere with respect to their financial situation."[5]  Id. ¶ 38.  Plaintiffs assert that they worked with NorthMarq and AmeriSphere during the remainder of 2009 and in early 2010 to gather the information and documentation required to support plaintiffs' HUD application.  Id. ¶¶ 38, 53-56.

Northwestern Mutual required from NorthMarq a timeline for completion of the application process along with a list of associated fees before it would issue a written document to plaintiffs in which it would agree to waive the pre-payment penalty and modify the terms of plaintiffs' mortgage.  Id. ¶ 41.  Plaintiffs allege that on February 3, 2010, "NorthMarq, via Kuhn, produced a timeline setting forth the phases of the loan application process and associated fees . . . to Brian Lee, a loan officer at Northwestern Mutual, along with a copy of the AmeriSphere engagement letter and Project Processing Summary."  Id. ¶ 42.  The timeline represented that the pre-application process "was 'on target' and the $22,000 in fees associated with this phase had been paid in full" and "the loan application would be submitted by AmeriSphere to HUD between February 15, 2010 and March 1, 2010."  Id. ¶¶ 43, 44.  Plaintiffs contend that the timeline provided for "a Final HUD Firm Commitment to issue within ten to thirty days of April 30, 2010.  Thereafter, the Timeline provided that the lender's funding commitment would be complete by May 30, 2010, with the loan to close thirty to sixty days thereafter, or by July 31, 2010 at the latest."  Id. ¶ 44.  Around February 2010, Northwestern Mutual issued a written loan modification agreement restructuring its loan to plaintiffs and

---

[5]        By June 30, 2009, a statement of the Northwestern Mutual mortgage balance reflected past-due payments and default interest accrued by plaintiffs.  Second Am. Compl. ¶ 38a.  Plaintiffs provided the statement to Kuhn in July, 2009.  Id.  A July 31, 2009 statement "reflected an even greater amount of past-due payments and default interest than the prior statement."  Id. ¶ 38b.  Plaintiffs provided this statement to Kuhn on September 1, 2009.  Id.

waiving the pre-payment penalty up to and through July 31, 2010.  Id. ¶ 47.  Plaintiffs assert that

"the written loan modification from Northwestern Mutual contained terms that made

continuation of this mortgage beyond July 31, 2010 detrimental to the financial condition of

Plaintiffs."  Id. at 50.  Nevertheless, plaintiffs executed the loan modification agreement in or

around February or March of 2010.  Id. ¶ 48.  Notwithstanding the loan modification, Chetty also

"signed a listing agreement . . . to advertise that the Millview Property was for sale."  Id. ¶ 51.

In February 2010 and over the next few months, representatives of AmeriSphere

requested additional information pertaining to plaintiffs' financial situation, credit and

occupancy, including month-to-month occupancy reports and information regarding plaintiffs'

credit scores.  Id. ¶¶ 52-57.  Plaintiffs provided the requested information, but were concerned

"with respect to Defendants' inability to follow the timeline" and expressed their concerns to

Kuhn.  Plaintiffs contend that Kuhn responded with continuous "verbal assurances that HUD

would issue a Firm Commitment, and that the loan would close by July 31, or Northwestern

Mutual would otherwise show leniency with respect to the pre-payment penalty."  Id. ¶¶ 56-58.

"In late April, 2010, AmeriSphere completed the HUD loan application" and

"AmeriSphere's internal loan processing committee . . . approved Plaintiffs' application."  Id.

¶ 59-60.  Plaintiffs aver that they were informed that their "application met all of the essential

criteria for the issuance of a HUD Firm Commitment."  Id. ¶ 60.  The second amended complaint

does not identify who made this communication to plaintiffs.  Id.  Plaintiffs contend that in

reliance on this representation, "Chetty wired a $95,040 non-refundable application fee (0.3% of

the loan amount) to AmeriSphere, which AmeriSphere forwarded to HUD with Plaintiffs' loan

application on April 30, 2010."  Id. ¶ 61.

"In May, 2010, Plaintiffs received an offer on the Millview Property in the amount of $37,250,000 from a prospective buyer." Id. ¶ 62.  Plaintiffs contend that they "declined to act promptly on the offer" because, "in reliance on Defendants' representations concerning the success of their application," "Plaintiffs' were awaiting a Firm Commitment from HUD." Id. Plaintiffs assert that in June and July 2010, James Vanar of AmeriSphere made representations to other financial institutions with which plaintiffs had outstanding indebtedness that "Plaintiffs would receive a Firm Commitment 'quite soon,' and that the loan would close within 30 days." Id. ¶ 64.  Despite Vanar's representations, Van Hoosen sent an email to Voigt on July 22, 2010 "stating that HUD was concerned about a credit reference letter issued by Northwestern Mutual on April 9, 2010." Id. ¶ 65.

HUD denied Plaintiffs' application for a Firm Commitment on July 30, 2011.  Id. ¶ 67. HUD's denial letter stated that plaintiffs' application "did not meet HUD's 'credit risk requirements and standards,' as a result of" questions about plaintiffs' ability to make timely payments due to a number of late and skipped payments on the Northwestern Mutual loan, resulting "'in a loan restructuring with a substantial increase in the interest rate and deferral' as well as 'delinquency on other loans.'"  Id. ¶ 68.  HUD also cited questions raised by uneven occupancy levels at the project.  Id.  After HUD denied their application for mortgage insurance, plaintiffs determined that they "had no choice but to sell the Millview Property to the prospective buyer," id. ¶ 75, and Northwestern Mutual enforced its pre-payment penalty against plaintiffs. Id. ¶ 76.

Plaintiffs claim that "Defendants had encouraged Plaintiffs to continue with the application process and advised Plaintiffs that they satisfied all of the criteria necessary for a

Firm Commitment from HUD" even though "[a]ll of the facts relating to [their] credit, payment history, and the occupancy history of the Millview Property that were cited by HUD as a basis for its denial of Plaintiffs' application, were known to Defendants from the early part of 2009 and throughout the entire application process."  Id. ¶ 69-70.  Plaintiffs assert that "[p]rior to and at various times throughout the application process, Kuhn represented to Plaintiffs that, unlike other lenders, HUD would qualify the loan based on the <u>future</u> performance and value of the property, not on the creditworthiness of the sponsor or the past performance of the property, such that Plaintiffs' financial situation and prior occupancy issues would not be an impediment to securing the 223(f) HUD loan."  Id. ¶ 35 (emphasis in original).  Plaintiffs allege that "Kuhn and Van Hoosen erroneously represented to Plaintiffs throughout the application process that Plaintiffs would have until 12 months after closing on the loan to achieve [a] 93% occupancy goal and never informed Plaintiffs that past fluctations in occupancy would be an issue."  Id. ¶ 40. Plaintiffs also contend that Kuhn represented to them that "Northwestern Mutual would be lenient with respect to any pre-payment penalties on the original mortgage" so long as "Plaintiffs continued to proceed with the HUD application process."  Id. ¶ 39.

Plaintiffs allege that they incurred damages "as a result of Defendants' negligence and fraudulent misrepresentations concerning Plaintiffs' ability to secure financing through HUD" and seek to recover "$2,600,000 in pre-payment penalties to Northwestern Mutual, in addition to the $95,040 non-refundable loan application fee, the $5,000 processing fee paid to NorthMarq in July, 2010, $22,000 in consultant fees; and other fees expended by Plaintiffs in conjunction with the loan application process."  Id. ¶ 76.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) permits a Court to dismiss all or part of an action for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6). Typically, "a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations," though the plaintiff's obligation to state the grounds of entitlement to relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).  "Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the allegations in the complaint are true (even if doubtful in fact)."  Id. (citations omitted).  The complaint must state "'enough facts to raise a reasonable expectation that discovery will reveal evidence of' the necessary element."  Wilkerson v. New Media Tech. Charter Sch. Inc., 522 F.3d 315, 321 (3d Cir. 2008), quoting Twombly, 550 U.S. at 556.  The Court of Appeals has recently made clear that after Ashcroft v. Iqbal, 129 S. Ct. 1937, 1955 (2009), "conclusory or 'bare-bones' allegations will no longer survive a motion to dismiss: 'threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.'  To prevent dismissal, all civil complaints must now set out 'sufficient factual matter' to show that the claim is facially plausible."  Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009), quoting Iqbal, 129 S. Ct. at 1949.  When reviewing motions to dismiss in light of Twombly and Iqbal, "[f]irst, the factual and legal elements of a claim should be separated.  The District Court must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions.  Second, a District Court must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a

'plausible claim for relief.'"  Id. at 210-11, quoting Iqbal, 129 S. Ct. at 1950.  "[A] complaint

must do more than allege the plaintiff's entitlement to relief.  A complaint has to 'show' such an

entitlement with its facts."  Id., citing Phillips v. Cnty. of Allegheny, 515 F.3d 224, 234-35 (3d

Cir. 2008).  "Where the well-pleaded facts do not permit the court to infer more than the mere

possibility of misconduct, the complaint has alleged–but it has not 'show[n]'–'that the pleader is

entitled to relief.'"  Iqbal, 129 S. Ct. at 1949.

**DISCUSSION**

I.      **Claims Against AmeriSphere**

        A.      **Negligence and Negligent and Fraudulent Misrepresentation**

        At the heart of plaintiffs' claims against AmeriSphere for negligence and negligent and

fraudulent misrepresentation is plaintiffs' contention that "[t]hroughout the loan application

process, AmeriSphere failed to timely perform its own responsibilities and adequately assess the

information and documentation provided to it which, if properly and accurately evaluated,

revealed that Plaintiffs would be denied a Firm Commitment from HUD."  Second Am. Compl.

¶ 123.  Plaintiffs' claims against AmeriSphere for negligence and negligent and fraudulent

misrepresentation clearly arise out of AmeriSphere's responsibilities as are set forth in the

engagement letter and therefore I find they are barred by the gist of the action doctrine.[6]

        Pennsylvania's gist of the action doctrine is a common law doctrine "designed to

maintain the conceptual distinction between breach of contract claims and tort claims."  eToll v.

Elias/Savion Advertising, Inc., 811 A.2d 10, 14 (Pa. Super. Ct. 2002) (citations omitted).  A tort

---

        [6]      Because I am granting AmeriSphere's motion on this basis, I need not address
AmeriSphere's argument that the economic loss rule bars these claims.

-11-

claim is barred by the gist of the action doctrine if:  (1) it arises solely from a contract between the parties; (2) the duties allegedly breached were created and grounded in the contract itself; (3) the liability stems from a contract; or (4) the tort claim essentially duplicates a breach of contract claim or its success is wholly dependent on the terms of a contract.  See Bryan's Quality Plus, LLC v. Shaffer Builders, Inc., No. 07-2311, 2008 WL 3523935, at *3 (E.D. Pa. Aug. 12, 2008) (citations omitted); eToll, 811 A.2d at 14.  "[T]he doctrine cannot be evaded by merely pleading that the defendant acted negligently, recklessly, or intentionally if the gravamen of the claim is that the defendant failed to perform a promise."  Tri Cnty. Realty, Inc. v. Lunaire Ltd., No. 06-1926, 2006 WL 3484355, at *2 (M.D. Pa. Nov. 30, 2006) (citations omitted).

        In their consolidated opposition to defendants' motions to dismiss, plaintiffs contend that their contract with AmeriSphere is "collateral" to their claim "that common law tort theories of reasonable care and the unlawfulness of fraud created a duty for AmeriSphere . . . not to lead Plaintiffs down a ruinous path toward a guaranteed HUD application denial while accepting tens of thousands of dollars in fees and otherwise causing damages to Plaintiffs."  Dkt. No. 45 at 10.  I disagree.  The negligent or fraudulent acts attributed to AmeriSphere in counts V, VI and VII of the second amended complaint all stem from Amerisphere's purported failures to perform the duties spelled out in the engagement letter.  Plaintiffs' second amended complaint asserts, inter alia, that they engaged AmeriSphere "to provide underwriting, analysis, and processing services with regard to Plaintiffs' 223(f) HUD loan application to re-finance the Millview Property," Second Am. Compl. ¶ 121, and that they "retained AmeriSphere to provide the services necessary to complete and submit the loan application to HUD."  Id. at ¶ 136.  The engagement letter required AmeriSphere to "[a]ssist [Plaintiffs] with FHA in all phases of the FHA Firm

Commitment processing" and, by its terms, governed "all phases" of the application process. Dkt. No. 39, Ex. A at 2.  AmeriSphere had no obligation to assist plaintiffs with their HUD application until AmeriSphere entered into the agreement with plaintiffs.  I will dismiss counts V, VI and VII of the second amended complaint.[7]

### B.   Fraud in the Inducement

In count VIII of the second amended complaint, plaintiffs assert a claim for fraud in the inducement against AmeriSphere, alleging that "[p]rior to executing the engagement letter with Plaintiffs, AmeriSphere knew or should have known that Plaintiffs were operating under a belief – based on representations made by Kuhn and NorthMarq – that Northwestern Mutual would indefinitely waive the prepayment penalty when plaintiffs signed the engagement letter and retained AmeriSphere to assist Plaintiffs in securing a 223(f) loan through HUD."  Second Am. Compl. ¶ 153.  Plaintiffs assert that "AmeriSphere should have apprised Plaintiffs that Northwestern Mutual's waiver of the pre-payment penalty was not indefinite prior to the execution of the engagement letter," id. at ¶ 154, and that "AmeriSphere concealed this information from Plaintiffs for the purpose of inducing Plaintiffs into signing the engagement letter with AmeriSphere."  Id. at ¶ 156.

I find that plaintiffs have not sufficiently pled a claim for fraud in the inducement against AmeriSphere.  The elements of a claim for fraud in the inducement under Pennsylvania law are:

> (1) a representation; (2) material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance.

---

[7]    Amendment of these claims would be futile.

KDH Elec. Sys., Inc. v. Curtis Tech. Ltd., No. 08-2201, 2011 WL 5428644, at *13 (E.D. Pa.

Nov. 4, 2011) (citations omitted); see also Partners Coffee Co., LLC v. Oceana Servs. and Prods.

Co., 700 F. Supp. 2d 720, 727 (W.D. Pa. 2010).  Plaintiffs do not allege that AmeriSphere ever

made a representation that Northwestern Mutual would indefinitely waive the prepayment

penalty.  Instead, plaintiffs allege only that AmeriSphere should have known that plaintiffs "were

operating under a belief" that Northwestern Mutual would indefinitely waive the prepayment

penalty.  Second Am. Compl. ¶ 153.  The representations alleged as the basis for plaintiffs' claim

in count VIII were made by Kuhn or NorthMarq, not AmeriSphere and plaintiffs' second

amended complaint does not contain sufficient allegations to support a conclusion that the

representations made by Kuhn or NorthMarq should be chargeable to AmeriSphere.  I will

dismiss count VIII of plaintiffs' second amended complaint with leave to amend.[8]

## II.     Claims Against NorthMarq and Kuhn

### A.     Gist of the Action

Like AmeriSphere, NorthMarq and Kuhn contend that plaintiffs' claims against them are

barred by the gist of the action doctrine.  NorthMarq asserts that the engagement letter governs its

relationship with plaintiffs because its "only relationship with Plaintiffs concerned the effort to

help Plaintiffs obtain FHA/HUD re-financing pursuant to the engagement letter" and "[i]t had no

other duties or obligations."  Dkt. No. 47 at 4.  As plaintiffs point out in their response to

---

[8]     Even if plaintiffs can allege that AmeriSphere made a representation or a basis for charging Kuhn and NorthMarq's representations to AmeriSphere, plaintiffs' fraudulent inducement claim may be barred under the gist of the action doctrine if "the precontractual statements that are the basis for the fraudulent inducement claim concern specific duties that the parties later outlined in the" engagement letter.  Integrated Waste Solutions, Inc. v. Goverdhanam, No. 10–2155, 2010 WL 4910176, at *11 (E.D. Pa. Nov. 30, 2010).

NorthMarq's motion to dismiss, however, "[t]here is no evidence in the record at all that NorthMarq was a party to the Engagement Letter between Amerisphere and Plaintiffs" and "there is no evidence in the record that NorthMarq was party to any contract that may or may not have existed between Amerisphere and Plaintiffs/Millview Apartment Homes."  Dkt. No. 45 at 2-3.

Plaintiffs allege only that they "retained NorthMarq to assist with the HUD application process."  Second Am. Compl. ¶ 34.  The second amended complaint then alleges that "Northmarq, via its employee, Kuhn, a professional broker, had a duty to exercise such care, skill prudence, and diligence as other members of the profession in advising Plaintiffs with regard to their financial condition, creditworthiness, financing options, and the 223(f) HUD loan application."  Second Am. Compl. ¶ 80; see also id. ¶ 90 ("NorthMarq and its employee, Kuhn, a professional broker, had a duty to exercise such care, skill, prudence, and diligence as other members of the profession in advising Plaintiffs with regard to their 223(f) HUD loan application and in managing the loan application process."); id. ¶ 101 ("NorthMarq and Kuhn had a duty to provide truthful and accurate information to Plaintiffs.").  The second amended complaint does not, however, identify the engagement letter or any other agreement as the source of NorthMarq or Kuhn's duties.

"Under the 'gist of the action' doctrine, plaintiffs are precluded from 'recasting' a claim for breach of contract into a tort claim."  Tower Ins. Co. v. Dockside Assocs. Pier 30 LP, --- F. Supp. 2d ----, No. 10-886, 2011 WL 2669076, at *5 (E.D. Pa. Jul. 7, 2011).  Absent allegations in the second amended complaint sufficient to establish a contractual relationship between plaintiffs and NorthMarq and Kuhn, and the scope of any such agreement, I find that the gist of the action doctrine cannot provide a basis for dismissal of plaintiffs' claims against NorthMarq

and Kuhn.  Cf. AT&T Corp. v. CPB Int'l, Inc., No. 05-424, 2007 WL 1811213, at *18-21 (M.D.

Pa. June 22, 2007) (declining to apply the gist of the action doctrine to grant summary judgment

to defendant where the contract between the parties was an implied contract in fact, not an

"express fully integrated and executed contract defining their rights and responsibilities" and

material factual disputes remained as to whether or not the work at issue in plaintiff's tort claims

was the subject of their contract).

> B.      **Negligence and Negligent Misrepresentation**

In count I of the second amended complaint, plaintiffs assert a claim for negligence

against NorthMarq and Kuhn.  Count II of the second amended complaint asserts a claim against

them for negligent misrepresentation.  To establish a claim for negligence under Pennsylvania

law, plaintiffs must first establish that the defendants owed them a duty of care.  See Merlini ex

rel. Merlini v. Gallitzin Water Auth., 980 A.2d 502, 506 (Pa. 2009).  To establish their claim for

negligent misrepresentation, plaintiffs must likewise establish that defendants owed them a duty.

Bortz v. Noon, 556 Pa. 489, 729 A.2d 555, 561 (Pa. 1999).  I find that plaintiffs have not alleged

sufficient facts to support the existence of a duty from Kuhn and NorthMarq to plaintiffs, thus

barring their claims for negligence and negligent misrepresentation.

Beyond its allegation that "Plaintiffs retained NorthMarq to assist with the HUD

application process in July 2009, with Kuhn managing the process," Second Am. Compl. ¶ 34,

the second amended complaint does not identify the source of NorthMarq and Kuhn's alleged

duties to them.  Plaintiffs simply allege without providing any supporting facts, statutes or case

law that "NorthMarq, via its employee, Kuhn, a professional broker, had a duty to exercise such

care, skill, prudence and diligence as other members of the profession in advising Plaintiffs with

regard to their financial condition, creditworthiness, financing options, and the 223(f) HUD loan application," id. ¶ 80, and that they "had a duty to provide truthful and accurate information to Plaintiffs." Id. ¶ 101.  Plaintiffs must allege a basis for the alleged duties of NorthMarq and Kuhn.  Under Twombly, it is not enough to simply allege that NorthMarq and Kuhn had a duty to plaintiffs.  See 550 U.S. at 555.  I will dismiss counts I and II of plaintiffs' second amended complaint with leave to amend to the extent that plaintiffs can allege sufficient facts to establish a basis for Kuhn and NorthMarq's duty to them.

### B.        Fraudulent Misrepresentation and Fraud in the Inducement

In count III of the second amended complaint, plaintiffs assert a claim for fraudulent misrepresentation against NorthMarq and Kuhn.  Plaintiffs' second amended complaint alleges that NorthMarq and Kuhn knew or should have known that their application "would lead to the denial of a Firm Commitment from HUD" and that "the loan would not close on or before July 31, 2010."  Second Am. Compl. ¶ 106-108.  Plaintiffs contend that NorthMarq, by and through Kuhn "falsely represented that HUD would issue a Firm Commitment" and that it "misrepresented that Northwestern Mutual would continue to waive the pre-payment penalty." Id. ¶ 106-107.

In count IV, plaintiffs assert a similar claim for fraud in the inducement against NorthMarq and Kuhn, alleging that "[f]rom the outset of Kuhn's discussions with Plaintiffs concerning the financing of the Millview Property, Kuhn and his employer, NorthMarq, represented to Plaintiffs that Northwestern Mutual would indefinitely waive the prepayment penalty or otherwise allow forebearance with respect to the original mortgage if Plaintiffs proceeded in applying for a 223(f) HUD loan through NorthMarq and Amerisphere."  Id. ¶ 112.

Plaintiffs further contend that "Kuhn, by nature of his experience and expertise in commercial real estate brokerage and financing, knew or should have known when he made such representations to Plaintiffs . . . that the waiver of a pre-payment penalty extended on behalf a [sic] primary mortgage holder is not indefinite, that Kuhn would be required to advise the primary lender of an accurate timeline with respect to refinancing the loan, and that Northwestern Mutual would enforce the pre-payment penalty." Id. ¶ 114.  Plaintiffs assert that they "justifiably relied upon the representations of Kuhn and his employer, NorthMarq, when they signed the engagement letter." Id. ¶ 118.

To establish their fraudulent misrepresentation claim plaintiffs must allege that NorthMarq and Kuhn made: "(1) [a] representation (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and, (6) the resulting injury was proximately caused by the reliance." Ira G. Steffy & Son, Inc. v. Citizens Bank of Pa., 7 A.3d 278, 290 (Pa. Super. Ct. 2010).  The elements of plaintiffs' claim for fraudulent inducement parallel those of their claim for fraudulent misrepresentation.  See KDH Elec. Sys., Inc., 2011 WL 5428644, at *13.  Fraudulent inducement may be found under Pennsylvania law where an "opposing party made false representations that induced the complaining party to agree to the contract." Toy v. Metropolitan Life Ins. Co., 928 A.2d 186, 205 (Pa. 2007) (quotation omitted).[9]

Plaintiffs' claims for fraudulent misrepresentation and fraud in the inducement cannot

---

[9]     Contrary to the typical claim for fraud in the inducement, the allegations in the second amended complaint establish that NorthMarq and Kuhn induced plaintiffs to enter into a contract with AmeriSphere, not with NorthMarq or Kuhn.

withstand NorthMarq and Kuhn's motions to dismiss because "[s]tatements as to future or contingent events, to expectations or probabilities, or as to what will or will not be done in the future, do not constitute misrepresentations, even though the statements may turn out to be wrong." Coleman v. Sears, Roebuck & Co., 319 F. Supp. 2d 544, 551 (W.D. Pa. 2003). "[P]romises to perform future acts are not misrepresentations unless the promise maker did not intend to fulfill the promise." Azarchi–Steinhauser v. Protective Life Ins. Co., 629 F. Supp. 2d 495, 501 (E.D. Pa.2009), citing Mellon Bank Corp. v. First Union Real Estate Equity & Mortg. Invs., 951 F.2d 1399, 1409 (3d Cir. 1991).

While plaintiffs' second amended complaint alleges that NorthMarq and Kuhn knew or should have known that plaintiffs' HUD application would be denied, their allegations do not support a conclusion that NorthMarq or Kuhn had any such knowledge.  Likewise, NorthMarq and Kuhn merely provided a prediction that Northwestern Mutual would indefinitely waive the prepayment penalty.  Neither Kuhn nor NorthMarq could guarantee the outcome of plaintiffs' HUD application; they could not guarantee that plaintiffs could close on a loan from AmeriSphere by a date certain and they could not promise that Northwestern Mutual would indefinitely waive the prepayment penalty.[10]  The alleged misrepresentations by Kuhn and NorthMarq concern actions and decisions that were ultimately to be taken or made by HUD and Northwestern Mutual.  NorthMarq and Kuhn could only offer their opinions as to whether or not plaintiffs' HUD application would be approved and whether Northwestern Mutual would enforce its pre-payment penalty.  Such opinions cannot constitute misrepresentations.  Coleman, 319 F.

_____

[10]     Northwestern Mutual in fact waived the prepayment penalty until one day after HUD rendered its decision on plaintiffs' application.  Second Am. Compl. ¶¶ 48, 67.

Supp. at 551.  Absent more specific allegations to support their claims that NorthMarq and Kuhn acted with knowledge and intent, plaintiffs' claims cannot withstand NorthMarq and Kuhn's motions to dismiss.

I will dismiss counts III and IV of plaintiffs' second amended complaint with leave to amend.

**III.    Concert of Action**

For a claim for concerted tortious conduct to exist, there must be viable underlying tort claims existing against the defendant.  See First United Bank & Trust v. PNC Fin. Servs. Grp., Inc. 667 F. Supp. 2d 443, 457 (M.D. Pa. 2009).  For the reasons set forth above, plaintiffs have not alleged any actionable tort claims against AmeriSphere, NorthMarq, or Kuhn.  Accordingly, I will dismiss count IX of the second amended complaint, but will grant plaintiffs leave to reassert the claim to the extent that they can allege sufficient facts to support a claim of fraud in the inducement against AmeriSphere and/or claims for negligence, negligent misrepresentation, fraudulent misrepresentation, or fraud in the inducement against NorthMarq or Kuhn.

An appropriate Order follows.